Filed 10/20/20  In re Pedro B. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re PEDRO B., a Person Coming Under the Juvenile Court Law. | B298954 (Los Angeles County Super. Ct. No. PJ52244) |
| THE PEOPLE, Plaintiff and Respondent, v. PEDRO B., Defendant and Appellant. |  |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Morton Rochman, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Laini Millar Melnick, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Heidi Salerno, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In a first amended petition filed by the Los Angeles County District Attorney's Office pursuant to Welfare and Institutions Code section 602, it was alleged that Pedro B. (minor)[1] committed attempted murder, caused great bodily injury, and used a deadly weapon (count 1; Pen. Code, §§ 664/187, subd. (a), 12022.7, subd. (a), & 12022, subd. (b)(1))[2] and committed assault with a deadly weapon and caused great bodily injury (count 2; §§ 245, subd. (a)(1), 12022.7, subd. (a)).

Minor denied the allegations.

After a contested adjudication, the juvenile court found the allegations true. It declared minor to remain a ward of the juvenile court and committed him to the division of juvenile facilities for a maximum of six years.

Minor appeals from the juvenile adjudication.

We agree with minor that the juvenile court wrongly found him guilty of the crime of second degree attempted murder, a crime that does not exist. Accordingly, we reverse that portion of the juvenile court's adjudication. Because minor was not sentenced on the assault with a deadly weapon allegation pursuant to section 654, the matter is remanded for resentencing on this charge and on any applicable enhancements.

---

[1] Minor was 17 years old at the time he committed the charged offenses. Because he was 19 years old at the time of the adjudication, he is sometimes referred to as the former minor.

[2] All further statutory references are to the Penal Code unless otherwise indicated.

2

## FACTUAL AND PROCEDURAL BACKGROUND

I. *Prosecution Evidence*

Alouis Felix Colgan (Colgan) met minor around the beginning of 2017, when minor's family moved into the apartment directly next door to his. Their apartments shared a wall. Colgan lived alone. Because Colgan suffered from Chronic Obstructive Pulmonary Disorder (COPD) and had had back surgery, it was difficult for him to walk up stairs. Colgan had been taking oxycodone each morning and at times hydrocodone, Norco, for seven years for his back. He used a cane, owning several, and a walker to get around, and used a wheelchair inside his apartment. Colgan kept his front door open because he smoked cigars. Colgan could see minor walking up and down the stairs to his apartment. He knew minor and his little brother. Colgan believed minor was about 15 or 16 years old and his brother was 11 or 12 years old.

Because of Colgan's disabilities, twice a week minor would take out his trash or pick up his mail when Colgan asked him and he would pay minor $5 because he knew minor needed money. He gave minor $200 for his sister when she had a baby. Colgan had a person assigned to him through his worker's compensation claim who came to his home three to five days a week, for two to three hours a day, to help him with shopping and cleaning.

On November 12, 2017, minor went to Colgan's apartment to ask for aspirin while Colgan was sitting in his recliner in the living room watching a football game. Colgan told him to look in the kitchen drawer. Minor asked if he had any trash he wanted him to take out. He told minor he did not know and to look at the trash. Knowing minor was in the kitchen, Colgan asked him if he

3

would get him a beer. Minor said, "'I don't play that game.'" Colgan walked into the kitchen and got a beer. When he passed by minor, Colgan said, "'excuse me'" and minor stepped back. After he got the beer and was on his way back out of the kitchen, minor walked toward him. He turned sideways to pass by minor and they bumped into each other. His rear end touched minor's legs. Colgan returned to sit in his wheelchair at his desk.

Suddenly, minor was standing a foot in front of him and reiterated, in a "seriously scary" tone, "'I don't play that game.'" Then Colgan felt a sharp stab in his head. He could see minor had a metal blade, which appeared to be a knife. Minor hit him in the head at least three or four more times before Colgan fell to the floor. His head was bleeding down his face and he could not see.

Colgan put his arms up to block more cuts from the knife. Minor cut Colgan's arms in several places. Minor stabbed Colgan in his chest four to five times and he lost consciousness. Minor stabbed him in his back. When Colgan regained consciousness, he had trouble breathing and had blood all over his face. Almost all of his white hair had turned brownish red. He asked minor for his cellphone so that he could call for help. Minor "deliberate[ly]" said he was taking his phone. In order to prevent bleeding to death, Colgan grabbed a metal trashcan next to him and pulled it tight to his chest, knowing his sister would arrive soon.

Colgan's sister arrived at his apartment to pick him up to go to dinner and shopping. When he did not answer his phone, she went to his apartment and could hear him screaming inside. She unlocked the door with her key and saw him lying on the floor near his desk holding a trashcan. He and the floor were

covered in blood. He told her that minor had attacked him. Colgan asked her to call the police. When she asked where his phone was, Colgan said, "'He took it.'" She ran back to her car to retrieve her phone and called 9-1-1.

Los Angeles County Deputy Sheriff Michael Miller, who was also an emergency medical technician (EMT), arrived to find Colgan lying face down in a pool of blood. Colgan had 15 stab wounds to his head and neck and 25 to 30 stab wounds to his chest and abdominal area. One wound was an evisceration to his abdominal area, causing his bowel to come out of his body. The stab wounds on his chest were bleeding profusely. When Deputy Miller turned Colgan over onto his back, his wounds began to bleed more profusely because the pressure Colgan had been applying to his wounds had slowed down the bleeding. Deputy Miller provided trauma dressings to slow the bleeding to prevent him from bleeding out.

The paramedics arrived and took Colgan to the hospital. Colgan was in surgery for several hours for wounds to his wrists, abdomen, bowels, and chest. Colgan spent a month in the hospital, six to eight weeks in a convalescent hospital, two months in assisted living, and then moved in with his sister because he could no longer care for himself. As a result of the stabbing, Colgan has bald areas on his head that no longer grow hair, and scars on his arms from cuts, which were stapled closed. He takes blood thinners, has nerve damage to his right hand, has posttraumatic stress disorder (PTSD), lost 20 pounds, has congestive heart failure, his teeth are decaying and falling out due to lack of blood flow, and his memory has been affected, including what happened during the attack.

In 2003, Colgan was convicted of two counts of indecent exposure, under section 314, and as a result had to register as a sexual offender, under section 290. Colgan was in a car accident in July 2017 while he was in Arizona attending an inpatient alcohol treatment program. His knee was injured in the accident and he had to be in a convalescent home for two weeks before he could return to the treatment center. Colgan had no memory of inviting minor's family over on Thanksgiving or Christmas the previous year. He did not remember communicating with minor's mother. Colgan testified that the beer he had requested that minor grab for him was nonalcoholic because he had been sober since going to the inpatient treatment in July 2017. After being shown photographs of the Coors Light in his refrigerator, Colgan stated that he was mistaken with his previous testimony.

On a prior occasion, Colgan had banged on minor's door. Colgan had also showed minor his revolver. Colgan owned a small club that was in the living room on the day of the stabbing. There were black marks on Colgan's wall around his thermostat caused by him hitting the wall with his club.

On another occasion prior to the instant offenses, Colgan accused minor of burglarizing his home and stealing his safe containing a handgun and $28,000 in cash. He reported the burglary to the police, told the police he thought minor did it, and spoke angrily to minor about the burglary. When Colgan came home to discover the burglary, he had minor come over to read the tagging on his wall and accused him of stealing the safe. After accusing him of burglary, he continued to have minor help him take out his trash.

Colgan never showed minor pornography. Colgan did not rub his hand on minor's thigh and up to his crotch. Colgan did

not try to hit minor with his cane when he tried to leave or pull him to the ground before the stabbing.

II. *Defense Evidence*

Los Angeles County Deputy Sheriff Garrett Gallegos testified that he took a report from Colgan on June 12, 2017, after his safe containing a firearm and approximately $25,000 in cash were stolen. Colgan told him that he believed minor had stolen the safe because he knew about the valuables in the home. Colgan told him that minor had asked Colgan to store some alcoholic beverages to hide them from his mother. Colgan told Deputy Gallegos that he did not want a print technician to fingerprint his residence because he had already cleaned the sliding glass door, which was where he believed the entry point was.

Los Angeles County Deputy Sheriff Jeffrey Burrow testified that he was the investigating officer for the stabbing. He took photographs after the stabbing. There was a trail of blood from Colgan's apartment to minor's apartment. Deputy Burrow searched minor's home.

Because minor said that Colgan had hit him with a cane or something similar, he went to Colgan's apartment. He recovered a club and four canes from Colgan's home.

Deputy Burrow spoke to Colgan in the hospital. Colgan told him that he told minor to get aspirin from his bathroom. Colgan said that he offered minor Vicodin, but minor declined. Colgan told Deputy Burrow that minor had punched him by surprise and that he did not remember having been stabbed. Colgan did not tell him that minor said he was going to take his cellphone. Colgan told him that he had rubbed against minor in the kitchen. Colgan also told Deputy Burrow that at minor's

7

request, he had loaned minor $1,800 and that minor never paid him back.

Patricia Barajas (Barajas) testified that she provided mental health services to minor and his younger brother and sometimes the whole family in their home once a week. She went to their home with a team of four people. She saw Colgan when she went to the home because his front door was always open.

Dr. Darrel Turner testified as an expert on grooming behaviors. He testified that grooming occurs when an adult who intends to have sexual contact with a minor engages the minor and normalizes sex, sexual contact, and sexual themes. Grooming can last from weeks to years before the offender commits sexual contact. The goal of grooming is to overcome resistance and minimize disclosure. Children who are marginalized, disconnected from their family, have been in legal trouble, have mental health issues, or have known behavior problems are more vulnerable to being groomed for a sexual assault because they have less credibility when they disclose. Offenders will engage in acts with plausible deniability, such as mistakenly showing pornography by leaving it up on the computer, which opens the discussion about sex, walking around the house naked with their door open, or walking by and accidentally rub a hand up the victim's thigh to his or her privates. They groom the environment around the child as well to gain access to the child and reduce the chance of people believing any disclosure, for example being kind and loaning money. Offenders use drugs, alcohol, and pornography with adolescent victims. Victims do not know they are being groomed. Offenders may accuse victims of breaking rules or stealing to create fear or guilt and to hold over the victim's head in order to

8

gain more compliance. The touching starts gradually with a pat or rub on the back, then a rub on the leg, and then a pat on the bottom; they test the waters to see what they can get away with without the victim complaining.

Developmental psychologist Dr. Elizabeth Cauffman testified as an expert in adolescent development, juvenile justice, and maturity in adolescents. She testified that maturity and the emotional system continue to develop into adulthood. Adolescents take more risks because they do not have the emotional ability to self-regulate until they are 25 years old. Development is broken down into early adolescence (10 to 13 years old), midadolescence (13 to 16 years old), late adolescence (16 to 18 years old), and young adulthood (19 to 20, 25 years old). Adolescents tend to be more reactive when threatened. Adolescents who abuse substances delay their brain development and are more likely to be impulsive. Trauma also delays brain development and delays self-regulation and, therefore, maturity. The majority of adolescents who commit crime desist over time as they mature; they grow out of criminal behavior. Most criminal behavior occurs from ages 18 to 20 and then declines.

Minor testified that he was born in Mexico, and came to the United States when he was seven years old. His parents neglected him, and Department of Children and Family Services (DCFS) came to his house in 2008. His father drank often and would get angry; he also physically abused minor and minor's mother. In 2014, he witnessed a friend die and violence in his own home.

Minor began drinking and smoking marijuana when he was 13 years old, three times a week. He found his father's crystal meth and meth pipe under their sink. Because his father would

get drunk and argue with him constantly, which would lead to physical or verbal abuse, minor ran away for one night. His mother would often be at work when his father was abusive. When he was 13 or 14 years old, DCFS came to their house again. DCFS required him to be in therapy due to his depression and his father's abuse. In April 2016, he was 16 years old and his family did not have food to eat.

In October 2016, minor's family moved to the apartment next to Colgan. Colgan introduced himself the day they moved in and told them if he ever screamed for help, to call an ambulance. Two days later, Colgan invited minor, his little brother and his mother into his house and told them if they ever needed help to come to him. He showed them his gun that he kept behind his couch. A few days later, minor began doing errands for Colgan because he said he was disabled. Minor took out his trash, got his mail, moved his furniture, vacuumed his house, and did other chores. Colgan paid minor $5 each time. Colgan left his front door open often.

For the first few months, Colgan was friendly. Colgan invited minor and his family over to eat on Thanksgiving and Christmas. Colgan regularly loaned minor's mother money to pay for rent and she would pay him back when she got paid. Minor spent most of his time with Colgan, three to four times a week, without other adults as his mother was usually at work. Colgan offered minor alcohol four times a week; and he bought minor alcohol when minor asked. A few months after they moved in, Colgan changed when he accused minor of stealing his toolbox, a pair of boots, a vacuum, ammunition, and money from his safe. After accusing him of stealing something, Colgan would

apologize and have him take out his trash again, and then in time would accuse minor of taking something else.

Three months after they moved in, Colgan was drunk and banged on their door asking for his vacuum, which minor had borrowed. Minor called the police and his sister put the vacuum by his door. On a couple other occasions, Colgan banged on their door or on their shared wall with his cane. On one occasion, minor recorded Colgan banging on his door with his cell phone so that they could show it to the police. Colgan had banged on his door for 20 minutes, yelling that he wanted his money and his gun that he thought minor had taken, and yelled racial slurs. Minor called the police. After Colgan was robbed, he accused minor of stealing his safe and gun. Colgan dragged minor to his house, and showed him tagging on his wall. He begged minor to read it, which he did. It said a gang name and that the gang were cop killers. After a few months, Colgan resumed asking minor to take out his trash.

Colgan showed minor a gun he wanted to buy on the computer and when he opened the Internet, it was on a pornography website. Colgan asked him about his sexual experiences. Colgan showed him a .357 revolver and a black and blue revolver in his apartment, as well as knives and a baton. While drunk, Colgan shot his gun into the air on his porch in front of minor on Christmas and on the Fourth of July. While outside his front door, minor saw Colgan hitting the wall around his thermostat with his baton while he was drunk after he discovered his gun had been stolen. Colgan screamed that whoever stole his gun was going to pay. Colgan kept his baton and gun behind the couch.

From October 2016 to November 2017, there were times that minor's home did not have enough food for the whole family. Colgan gave minor food.

Minor had trouble sleeping because he was scared his father would come home drunk and start beating him or his mother. Minor told his therapist, Barajas, about Colgan because he accused minor of taking items that were missing from his house and would yell his name from his apartment. Barajas asked minor if he ever abused him. He told her no.

In October 2017, after being placed at the Boys Republic in San Bernardino and then staying with his uncle, he moved into his own apartment.

On November 12, 2017, minor had spent the night before at his mother's apartment and was cleaning her house. Colgan asked minor if he would get his mail and take out his trash. After retrieving the mail and taking out the trash, he took a shower. He asked Colgan if he had aspirin. Colgan told him that he had Norco and he could come inside and take it. Minor entered Colgan's apartment and stood a foot behind Colgan while they looked in the drawer at his computer desk. Minor felt Colgan's hand reach behind him and rest it on his thigh. Colgan's hand moved up to minor's crotch. Minor said, "'I don't play that game.'"

Minor tried to push Colgan away but instead he pushed himself backward. Colgan, who appeared to be drunk, swung his cane at minor. Minor backed away and Colgan struck the back of minor's hand with the cane. Minor hit Colgan four times in the face with his fists. Colgan grabbed him and tried to pin him down and they both fell down, knocking over the coffee table;

Colgan landed on top of minor, who was face down. Minor tried to get up, but Colgan was holding his knees.

Minor saw a knife on the ground that had fallen off the coffee table. He told Colgan if he did not let go, he was going to stab him. Colgan told him not to leave and not to tell anyone. Minor picked up the knife, stabbed Colgan's right arm, and then stabbed his left arm. They struggled and changed positions with minor on top of Colgan. Because Colgan would not let him go, minor stabbed him five times in the chest. Colgan finally released his grip and minor stopped stabbing him and went to his mother's house, leaving a trail of blood behind him. He took the knife with him. Minor thought Colgan was reaching for something but did not know what; he was afraid it was his baton.

Minor returned to Colgan's apartment after he thought he lost his cellphone and picked up the phone he saw on the ground. He later found his phone in his back pocket and threw the other cellphone away. That night, he turned himself into the police. He told the police that he was unsure whether Colgan had touched him on purpose, that Colgan had tried to hit him with his cane, not that he had, and that Colgan asked him why he was doing this and asked him to call 9-1-1, which minor refused to do.

Forensic psychologist Dr. Michelle Margules testified as an expert on trauma and PTSD. She had examined minor and reviewed various records. Minor had a diagnosis of PTSD and had a history of abuse and neglect and substance abuse. Abuse impacts children's social, emotional, and cognitive development as well as memory, concentration, trusting adults, and hypervigilance. Minor had difficulty with his memory with certain childhood events and around the offense as well as

difficulty sleeping and nightmares around the abuse he experienced, depression, explosive outbursts, and hypervigilance.

**DISCUSSION**

I. *Attempted second degree murder finding*

Minor contends that his conviction of attempted second degree murder must be reversed because (1) that offense does not exist, and (2) implied malice is insufficient to support a conviction of attempted murder.

A. Proceedings below

During his summation, the prosecutor argued that the facts supported first degree attempted murder because minor had the intent to kill Colgan when he stabbed him between 20 to 45 times. The prosecutor then argued, in the alternative, the facts that supported second degree attempted murder, which was based on implied malice.

The juvenile court thereafter issued its findings, stating: "In conclusion, this court is convinced beyond a reasonable doubt to the truth of the charges and finds [minor is] guilty of the crime of attempted murder. The court fixes it at 2nd-degree attempted murder. [¶] The court finds the enhancement of personally inflicting great bodily injury to be true and the further enhancement of personally using a deadly and dangerous weapon to wit, a knife to be true."

The matter was continued for disposition.

Prior to the continued hearing, the People submitted a sentencing brief, reiterating that minor "was convicted of Attempted Second-Degree Murder." The People pointed out that minor "face[d] a maximum sentence of 9 years for the attempted murder," plus an additional four years for the enhancements, making his "total exposure . . . 13 years." In so noting, the People

14

indicated that pursuant to section 654, subdivision (a), "the assault with a deadly weapon [charge] merge[d] with the attempted murder charge for purposes of sentencing."

At the disposition hearing, the juvenile court reiterated that minor was found guilty of "attempted murder in the 2nd degree." After commenting that minor faced a maximum sentence of 13 years, it ordered him to be committed to the division of juvenile facilities for six years.

B. <u>Relevant law</u>

The crime of attempted second degree murder is a misnomer. As explained in *People v. Favor* (2012) 54 Cal.4th 868, 877, there is no substantive crime of attempted second degree murder. The offense of premeditated attempted murder is not a separate offense from attempted murder. (*Ibid*.) Specific intent to kill is a requisite element of attempted murder, and implied malice is insufficient to sustain such a charge. (*People v. Smith* (2005) 37 Cal.4th 733, 739; *People v. Lee* (1987) 43 Cal.3d 666, 670.)

C. <u>Analysis</u>

We agree with minor that the juvenile court erroneously convicted him of attempted murder in the second degree. There is no such crime. It follows that minor's conviction of this charge must be reversed.

Urging us to affirm, the People argue that there is sufficient evidence to support the juvenile court's true finding that minor committed attempted murder, as alleged in count 1. After all, there is ample evidence of intent and express malice. What the People are essentially asking us to do is determine either that the juvenile court (1) implicitly and necessarily found minor guilty of attempted murder, because attempted murder is

15

not divided into degrees (*People v. Montes* (2003) 31 Cal.4th 350, 353, fn. 2), or (2) *could* have found minor guilty of just attempted murder.

The problem is that we cannot ignore the juvenile court's express language, which followed the prosecutor's argument regarding implied malice. Following the presentation of the evidence, the prosecutor submitted her closing argument, specifically asserting that the juvenile court had a choice—it could find minor guilty of attempted first degree murder, or, "in the alternative, if the court were to disagree with the People, although we are confident that we have established this and we have proven this beyond a reasonable doubt, there is still an attempted 2nd-degree murder. [¶] And that's because with attempted 2nd-degree murder there is an implied malice." The prosecutor went on to discuss the four factors for implied malice and the evidence that supported each of those factors.

After listening to this argument, the juvenile court then issued its ruling, specifically finding minor guilty of attempted second degree murder. Two weeks later, at disposition, the juvenile court reiterated that it found minor guilty of attempted murder in the second degree.

Based upon the foregoing, it is evident that the juvenile court convicted minor of attempted second degree murder, not just attempted murder. (See *People v. Favor*, *supra*, 54 Cal.4th at p. 877 [the offense of premeditated attempted murder is not a separate offense from attempted murder].) And it is possible that the juvenile court did so on the erroneous assumption that minor could be convicted on a theory of implied malice. (*People v. Collie* (1981) 30 Cal.3d 43, 62 [conviction for attempted second degree murder reversed because the trial court erroneously instructed

16

the jury that it need not find a specific intent to kill in order to convict], superseded by statute on other grounds as stated in *People v. Champion* (1995) 9 Cal.4th 879, 912–913.) After all, that is what the People argued prior to the juvenile court's disposition.

The People further assert that the fact that the juvenile court fixed minor's crime at second degree murder does not mean that the evidence only supported implied malice. Rather, according to the People, the juvenile court "fix[ed]" minor's sentence at second degree murder in order to impose some sort of reduced sentence. Nothing in the appellate record supports the People's contention. When the juvenile court sentenced minor, it did not indicate that it was doing so in order to impose some sort of lesser sentence.

In light of the foregoing, we reverse the juvenile court's true finding that minor committed attempted second degree murder. Because minor was not sentenced on count 2 (assault with a deadly weapon), the matter is remanded to the juvenile court for resentencing on count 2 and any applicable enhancements.

II. *The juvenile court properly excluded the additional evidence of the victim's prior aggressive conduct*

Minor contends that the juvenile court erred in excluding certain evidence of Colgan's prior aggressive and volatile conduct, which deprived him of his constitutional right to present a complete defense of self-defense. Specifically, minor argues that the juvenile court should have (1) admitted into evidence the videotape showing Colgan banging on his door, (2) allowed Barajas to testify about a dispute between Colgan and minor's

17

mother, and (3) allowed other family members to testify about angry disputes they had witnessed involving Colgan.

A. Proceedings below

Minor argued that because Colgan had allegedly inappropriately touched him, he stabbed him in self-defense to get away. He further asserted that he stabbed Colgan in response to Colgan grooming him and knowing that Colgan was aggressive.

1. *Video recording*

In support of those claims, in a motion in limine, the defense moved to introduce a video taken on minor's phone of Colgan banging on minor's door. He argued that the video was relevant because it showed that Colgan had a history of aggressiveness, which explained why minor interpreted Colgan's behavior as a sexual assault and caused him to stab Colgan.

The People objected to the video as it lacked foundation, was hearsay, and was irrelevant.

The juvenile court viewed the approximately one-minute long video and found it not relevant. Later, minor again requested to show the video. The juvenile court found that in lieu of admitting the recording, minor could testify about what he saw and heard firsthand.

Minor testified that he had recorded Colgan banging on his door on this particular occasion because Colgan had banged on their door in the past and they wanted evidence to show the police. When the defense attempted to play the video, the juvenile court reiterated that it had excluded the video. Minor then testified as to why he made the recording and the circumstances surrounding it.

18

Later in the proceedings, minor again requested to introduce the video. The juvenile court again denied the request, stating that minor's testimony about what he saw and heard was sufficient.[3]

2. *Witness testimony about an altercation between Colgan and minor's mother*

During motions in limine, the prosecution moved to bar testimony from Barajas, the family social worker, concerning an altercation between Colgan and minor's mother.[4] At that time, the juvenile court indicated that it would "take [the witnesses] one at a time."

Later, during the proceedings, the People requested that the juvenile court rule on the motion. Minor stated that he intended to introduce testimony concerning a verbal dispute in a parking lot between Colgan and his mother to show Colgan had a history of aggressiveness, which supported his interpretation of Colgan's behavior as a serious threat when minor stabbed him. The juvenile court asked when that verbal alteration occurred. Minor responded sometime prior to November 12, 2017, but he did not know the precise date. The juvenile court made a preliminary ruling that the evidence was not relevant, but reserved the matter for when the issue came up in testimony.

---

[3] Subsequently, minor asked that his two sisters be allowed to testify about the incident where Colgan was violently banging on the door and yelling. The juvenile court denied that request.

[4] The prosecution also sought to bar testimony from another person who had apparently witnessed the incident between Colgan and minor's mother.

When Barajas was testifying, minor asked whether she had witnessed an incident between Colgan and his mother. After the People objected, the defense explained that the evidence was relevant to prove a character trait of Colgan. The juvenile court found that Barajas's testimony was (1) inadmissible hearsay because minor had not observed the incident, and (2) irrelevant.

3. *Minor again requests that these witnesses be allowed to testify*

After minor testified, he again requested that Barajas and certain family members be allowed to testify concerning Colgan's erratic and violent behavior, which included the event that he had recorded. The juvenile court rejected the request. Minor argued that the juvenile court was not allowing any evidence to show Colgan had ever been violent or had problems with him and his family. The court explained that the proffered evidence was irrelevant: "The issues here are very clear, very clear, [defense counsel]. You know what the petition alleges. You know what both counts are. We heard your defense. Now, we have to come to a conclusion and resolve this matter. [¶] . . . [¶] That evidence is cumulative. We have heard it from your client over many, many hours."

B. Relevant law

"Only relevant evidence is admissible [citations], and all relevant evidence is admissible, unless excluded under the federal or California Constitution or by statute." (*People v. Scheid* (1997) 16 Cal.4th 1, 13; see Evid. Code, §§ 350, 351.) Relevant evidence is evidence that "tend[s] in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

Generally, evidence of a person's character (including, for example, a specific instance of his conduct) is inadmissible when offered to prove his conduct on a specific occasion. (Evid. Code, § 1101.) However, Evidence Code section 1103 posits the following relevant exception: "(a) In a criminal action, evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by Section 1101 if the evidence is: [¶] (1) Offered by the defendant to prove conduct of the victim in conformity with the character or trait of character."

In a prosecution for an assaultive crime where self-defense is raised, the person acting in self-defense must actually and reasonably believe that force was necessary to defend against imminent harm. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082; *In re Christian S.* (1994) 7 Cal.4th 768, 783.) While evidence of the victim's prior violent acts is admissible (Evid. Code, § 1103, subd. (a)(1); *People v. Shoemaker* (1982) 135 Cal.App.3d 442, 446), the trial court may exclude such evidence if it has no tendency to prove a material issue of disputed fact, such as the defendant's reasonable fear or the existence of some present and imminent danger. (See *People v. Boyette* (2002) 29 Cal.4th 381, 428; *People v. Minifie* (1996) 13 Cal.4th 1055, 1068.) Past acts of violence that threaten some vague, unspecified future harm fail to provide grounds for self-defense. (See *People v. Humphrey*, *supra*, 13 Cal.4th at p. 1082.) The record must contain evidence that the victim was the aggressor or posed some imminent danger during the current incident. (*People v. Minifie*, *supra*, 13 Cal.4th at pp. 1067–1068.) Then and only then is the

21

evidence of the victim's prior violent acts relevant to bolster a claim of self-defense.  (*Ibid.*)

"[A] defendant has no constitutional right 'to present all relevant evidence in his favor, no matter how limited in probative value such evidence will be so as to preclude the trial court from using Evidence Code section 352.'  [Citation.]"  (*People v. Shoemaker, supra*, 135 Cal.App.3d at p. 450; see also *People v. Cornwell* (2005) 37 Cal.4th 50, 82, disapproved in part on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)  It is well-established the trial court has broad discretion in determining both the relevance of the objected-to evidence and in weighing its prejudicial effect against its probative value.  (*People v. Harrison* (2005) 35 Cal.4th 208, 229; *People v. Sanders* (1995) 11 Cal.4th 475, 512; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)  As such, a trial court's ruling is not disturbed on appeal "'except on a showing the court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.  [Citations.]'"  (*Id.* at pp. 1124–1125.)

      C.  Analysis

          1.  *No error*

Applying these legal principles, we conclude that the juvenile court did not abuse its discretion in excluding the additional evidence.  The juvenile court admitted evidence relevant to minor's state of mind to support his claim of self-defense, including minor's testimony that Colgan banged on his door while yelling and demanding that his items be returned.  The evidence also included minor's testimony that Colgan grabbed him and brought him to his apartment to read the tagging on his wall after his safe, which Colgan accused minor of

22

stealing, had been stolen.  In light of this evidence, the juvenile court acted well within its discretion when it refused the evidence of the video recording of Colgan banging on minor's door and his family witnessing the same episode as being cumulative.

The juvenile court also properly excluded the witnesses to the verbal altercation between Colgan and minor's mother—an altercation that occurred outside of minor's presence (and minor may not have even been aware of).  Minor never contended that Colgan threatened anyone, including himself, during that altercation.  Given that yelling alone cannot provide a justification for self-defense (*People v. Johnston* (2003) 113 Cal.App.4th 1299, 1308), the juvenile court did not abuse its discretion in excluding evidence of the victim yelling at a third party on an unspecified date outside the presence of the charged offender to show that offender's state of mind.

### 2. *No prejudice*

In any event, minor was not prejudiced by the juvenile court's refusal to admit the recording or his family members' testimony about the same incident.  Refusing to admit cumulative evidence is not prejudicial.  (*People v. Harris* (1989) 47 Cal.3d 1047, 1093; *McCarthy v. Manhattan Beach* (1953) 41 Cal.2d 879, 895.)

Nor was minor prejudiced when the juvenile court refused to hear testimony concerning Colgan's verbal altercation with minor's mother because that evidence would have had no bearing on minor's subjective state of mind for purposes of self-defense.

"The subjective elements of [perfect] self-defense and imperfect self-defense are identical.  Under each theory, the appellant must actually believe in the need to defend himself against imminent peril to life or great bodily injury." (*People v.*

23

*Viramontes* (2001) 93 Cal.App.4th 1256,1262; *People v. Oropeza* (2007) 151 Cal.App.4th 73, 82 [same].) What distinguishes the two theories is that perfect self-defense includes, but imperfect self-defense lacks, the requirement that the belief be reasonable. (*People v. Viramontes*, *supra*, at p. 1262.) Since the subjective elements of perfect and imperfect self-defense are identical (*ibid*.) (and lacking any reasonableness requirement), it follows the defendant may use deadly force in imperfect self-defense as long as the use of such force is motivated only by a fear and belief that it is necessary to prevent the party's death or great bodily injury. In other words, the defendant must have acted under the influence of such fear alone. (See *People v. Trevino* (1988) 200 Cal.App.3d 874, 879 ["The party killing is not precluded from feeling anger or other emotions save and except fear; however, those other emotions cannot be causal factors in his decision to use deadly force"].)

Here, minor's actions in stabbing Colgan 20 to 45 times, including in his chest, his abdomen, and his back, showed that minor did not act out of fear alone; he did not seek to just stop Colgan from hurting him, but sought to punish him. (*Villines v. Tomerlin* (1962) 206 Cal.App.2d 448, 457 ["Self-defense may be resorted to in order to repel force, but not to punish"].) Therefore, testimony about a verbal altercation between Colgan and minor's mother, an altercation that minor may or may not have been aware of, would not have aided his self-defense claim.

III. *The juvenile court properly excluded the additional evidence of Colgan's sexual misconduct*

Minor contends that the juvenile court abused its discretion when it excluded additional evidence of Colgan's sexual misconduct.

A. <u>Proceedings below</u>

The juvenile court admitted evidence of Colgan's conviction of indecent exposure under section 314 and the requirement that he register as a sex offender under section 290. The evidence was presented in the form of Colgan's testimony and the court records concerning his conviction. The juvenile court denied minor's request to examine Colgan about the details surrounding the charge. The juvenile court also excluded evidence that Colgan allegedly masturbated in front of minor's younger brother.

B. <u>The juvenile court did not err</u>

Minor complains of the exclusion of additional details of the charged act and the uncharged act involving his younger brother, which were probative of the victim's violent character, denied him his right to present his self-defense claim. However, as discussed above, even assuming minor's claims are true, because minor was not in imminent danger of death or great bodily injury when Colgan allegedly touched his thigh and moved his hand toward his genitals, this additional evidence was inadmissible. "[I]f it clearly appears that the defendant was the aggressor or that he was in no imminent danger of death or great bodily harm, evidence of prior acts of violence upon other persons by the deceased is not admissible." (*People v. Soules* (1940) 41 Cal.App.2d 298, 307.) "The trial court has a sound discretion to determine from all of the facts and circumstances adduced whether a prima facie showing of good faith on the part of the defendant has been established sufficiently to warrant the reception of evidence of prior acts of violence upon other persons by the deceased." (*Ibid.*)

Nevertheless, the juvenile court did admit evidence of Colgan's conviction of indecent exposure and that he was a

registered sex offender, including the court records on the conviction. Therefore, contrary to minor's assertion otherwise, ample evidence was admitted to aid in his self-defense claim. The juvenile court only refused to allow minor to examine Colgan about the details of the conviction as it would have been cumulative, and refused to admit minor's brother's allegation against Colgan.

The juvenile court had sufficient evidence of Colgan's past misconduct to understand minor's claim that he was on heightened alert when Colgan touched him because he believed that Colgan was a predator. The juvenile court heard and understood that minor feared Colgan. The juvenile court understood minor's defense and considered it. It follows that the juvenile court was not required to admit additional evidence to show minor's state of mind. (*People v. Soules*, *supra*, 41 Cal.App.2d at p. 307.)

Moreover, minor was not prejudiced by the juvenile court's decision. As set forth above, the requested evidence would not have shed any additional light on minor's claim of self-defense.

IV. *The juvenile court did not abuse its discretion in permitting evidence of minor's gang membership*

Minor contends that the juvenile court erred in permitting impeachment of his testimony with evidence of his gang association and in refusing rebuttal evidence.

A. <u>Proceedings below</u>

Minor sought to exclude the reference made to his association to a gang in the 9-1-1 call made by Colgan's sister. The juvenile court granted his request and struck the phrase "gang member" from the transcript.

During cross-examination of minor, the prosecutor asked him whether he felt Colgan had disrespected him. Minor answered in the affirmative. Over defense objection, the prosecutor asked whether he was a member of the gang Newhall 13. The juvenile court found that the People could introduce evidence of whether minor was a gang member solely for impeachment purposes to counter his state of mind claim. Minor admitted that he had been a member during the attack, but denied being a current member. Over defense objection, the prosecutor asked minor whether he had thrown gang signs while currently being detained. Minor replied that he had not. Over defense objection, the prosecutor showed minor a photograph of him throwing a gang sign while in detention. Minor admitted that the photograph was of him. The prosecutor asked minor what his tattoos meant, and he testified that they stood for New York Yankees. Over defense objection, the prosecutor asked whether they stood for Newhall Youngsters, and minor answered in the affirmative.

Minor moved to strike the gang evidence, arguing prosecutorial misconduct in presenting irrelevant prejudicial evidence. The juvenile court denied the motion.

Minor requested to recall Colgan's sister to testify about her knowledge of minor's membership in a gang, and to recall Colgan to testify whether he knew minor was a member of a gang

27

and, if so, why he continued to allow minor in his home. The juvenile court denied the request.

B. <u>Relevant law</u>

As set forth above, only relevant evidence is admissible. "[T]he decision on whether evidence, including gang evidence, is relevant, not unduly prejudicial and thus admissible, rests within the discretion of the trial court. [Citation.] 'Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion "must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]" [Citation.]' [Citations.] It is appellant's burden on appeal to establish an abuse of discretion and prejudice." (*People v. Albarran* (2007) 149 Cal.App.4th 214, 224–225.)

C. <u>Analysis</u>

1. *No error*

Here, the juvenile court did not err in admitting evidence of minor's gang membership and in excluding minor's rebuttal evidence. The juvenile court was entitled to consider minor's gang membership to determine his state of mind as being disrespected, rather than being fearful. (Evid. Code, § 780, subds. (c), (f), (j).) The probative value of the evidence was not substantially outweighed by the probability that its admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the court. (Evid. Code, § 352; *People v. Ewoldt* (1994) 7 Cal.4th 380, 404, superseded by statute on other grounds as stated in *People v. Robertson* (2012) 208 Cal.App.4th 965, 991.)

28

Moreover, neither of the requested rebuttal witnesses would have assisted the court in deciding whether Colgan had groomed and sexually assaulted minor, which then resulted in minor defending himself with a knife. Regarding Colgan's sister, minor does not explain how what she knew about minor's gang membership was relevant to any of the issues in this case. Regarding Colgan, if he had said that he knew that minor was a gang member, but continued to ask him for help because he was his neighbor, such evidence would not necessarily have bolstered minor's claim that Colgan must have been grooming him. In fact, minor had already testified that Colgan asked him to decipher gang tagging on his wall, which strongly suggested that Colgan knew of minor's gang membership, and continued to ask him to help him do chores. Further testimony on this fact was unnecessary and cumulative.

2. *Any error would have been harmless*

In any event, any error in allowing the gang evidence was harmless. It is not reasonably probable that a result more favorable to minor would have occurred had the objectionable evidence not been admitted.[5] (*People v. Bojorquez* (2002) 104 Cal.App.4th 335, 345.)

The only issue in this case was whether minor's attack of Colgan was in self-defense. Because of the limited issue at trial, minor's gang affiliation was not prejudicial as it had no real bearing on that issue. This was not a gang-related case. There is

---

[5] The purported error was not prejudicial under any applicable standard. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [reasonable probability standard for state law error]; *Chapman v. California* (1967) 386 U.S. 18, 24 [stricter beyond-a-reasonable-doubt standard for federal constitutional error].)

no reasonable probability that, had the evidence of minor's gang membership been excluded, minor would have secured a more favorable result. Assuming minor was telling the truth, that Colgan touched his thigh and slid his hand up to his groin and then swung his cane at minor, the only issue is whether the force minor inflicted on Colgan was proper self-defense or punishment. As discussed above, given the length and intensity of the attack, it was not self-defense. Minor's use of force went well beyond what was reasonable under the circumstances.

V. *No cumulative error*

Minor contends that the cumulative effect of the alleged errors violated his right to due process and was not harmless beyond a reasonable doubt. However, as set forth above, the juvenile court did not commit any of the alleged errors during trial; and, even if it had, minor has failed to show that he was prejudiced by those claimed errors. (See *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 308, 334; *People v. Famalaro* (2011) 52 Cal.4th 1, 44; *People v. Phillips* (2000) 22 Cal.4th 226, 244.)

A defendant is guaranteed a fair trial, not a perfect one. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) The record here shows that minor received a fair trial. (See *People v. Montiel* (1993) 5 Cal.4th 877, 944, overruled in part on other grounds as stated in *People v. Perez* (2020) 9 Cal.5th 1, 9 [errors do not require a reversal whether considered singly or together as they had a minimal impact on the overall fairness of the defendant's trial].)

**DISPOSITION**

The conviction on count 1 is reversed.  The matter is remanded for resentencing on count 2 and any applicable enhancements.  In all other respects, the judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, Acting P. J.
ASHMANN-GERST


We concur:


_____, J.
CHAVEZ


_____, J.
HOFFSTADT